Eugene G. Iredale SBN: 75292
Julia Yoo  SBN: 231163
IREDALE & YOO, APC
105 West F Street, 4th Floor
San Diego, CA 92101-6036
Tel: (619) 233-1525
Fax: (619) 233-3221
Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| R.M., C.DlC., individuals,<br><br>          Plaintiffs,<br><br>v.<br><br>METROPOLITAN INTERPRETERS and TRANSLATORS, INC., a corporation, J.C., an individual, R.P., an individual, C.G., an individual,<br>and DOES 1-20, inclusive,<br><br>          Defendants. | Case No.:  **'14CV1797 BAS RBB**<br><br>**COMPLAINT FOR:**<br><br>**(1)  VIOLATION OF EMPLOYEE POLYGRAPH PROTECTION ACT 29 USC § 2002 (1)**<br><br>**(2)  VIOLATION OF EMPLOYEE POLYGRAPH PROTECTION ACT 29 USC § 2002 (2)**<br><br>**(3)  VIOLATION OF EMPLOYEE POLYGRAPH PROTECTION ACT 29 USC § 2002 (3)**<br><br><br>JURY TRIAL IS HEREBY DEMANDED |

COME NOW, Plaintiffs by and through their attorneys of record, and allege and complain as follows:

## I.
## INTRODUCTION

Plaintiffs worked as linguists for Metropolitan Interpreters and Translators, Inc. ("Metropolitan"), a private corporation that contracted with various governmental agencies nationwide.  Metropolitan had a contract with the Drug Enforcement Administration and Immigration and Customs Enforcement in Imperial County.  Plaintiffs, as employees of Metropolitan, provided translation services for DEA and ICE in Imperial County.  In 2011, Metropolitan and DEA requested, required and demanded that all linguists working in their San Diego and Imperial County offices take polygraph exams.  Defendant C.G., the Metropolitan site supervisor in Imperial County, made all arrangements for Plaintiffs take the DEA administered polygraph exams as a condition of employment.  If the employees "failed" or refused the test, or had inconclusive results, they would lose their "clearance" to be in the DEA offices, meaning that they would be terminated from their jobs.

Metropolitan was not conducting an investigation involving economic loss to Metropolitan.  Nor did Metropolitan have any individualized suspicion that any of the Plaintiffs had committed a crime or engaged in wrongdoing.  Rather, Defendants imposed the blanket requirement that every linguist in San Diego and Imperial County take polygraphs. Defendants  provided no written material to Plaintiffs which explained the purpose of these mandatory tests nor the basis for any investigation or suspicion; nor did Defendants give written notice of the employees' rights under federal and state law.

The polygraph testing in this case was prohibited by the Employee Polygraph Protection Act of 1988, 29 U.S.C. §§ 2001, *et seq*. ("EPPA") Defendants effectively terminated Plaintiffs and other employees  from their

2

employment either for "failing" the polygraph test, or having an inconclusive test result.

**II.**
**GENERAL ALLEGATIONS**

1.     Jurisdiction is proper in the United States District Court for the Southern District of California pursuant to 28 U.S.C. §1331 and 29 U.S.C. §§ 2001 *et seq*.

2.      Venue is proper in the Southern District of California pursuant to 28 U.S.C. §1391(b), because at all times relevant hereto, a substantial part of the events or omissions giving rise to the subject of the action occurred in Imperial County.

**III.**
**PARTIES**

3.     At all times relevant to this complaint, Plaintiffs were individuals residing in Imperial County, California.

4.     At all times relevant to this complaint, Defendant METROPOLITAN INTERPRETERS and TRANSLATORS, INC. (hereinafter "METROPOLITAN") was a nationwide corporation operating throughout the United States, including Imperial County, California and employing the individual Defendants who were acting within the course and scope of their employment.

5.     Defendant J.C. was the Vice President of Defendant METROPOLITAN.

6.     Defendant R.P. was an employee of Defendant METROPOLITAN and a supervisor.

7.     Defendant C.G. was an employee of Defendant METROPOLITAN and the site supervisor in Imperial County.

8.     The individual defendants participated in, promoted, approved and executed Metropolitan's corporate policy in contravention of the EPPA.

9.     Plaintiffs are truly ignorant of the true names and capacities of DOES 1 through 20, inclusive, and/or are truly ignorant of the facts giving rise to their liability and will amend this complaint once their identities and the facts giving rise to their liability have been ascertained.

10.     These defendants were agents, servants and employees of other named defendants and were acting at all times within the full course and scope of their agency and employment, with the full knowledge and consent, either expressed or implied, of their principal and/or employer and each of the other named defendants.  Each of the defendants had approved or ratified the actions of the other defendants, thereby making the currently named defendants herein liable for the acts and/or omissions of their agents, servants and/or employees.

**IV.**
**FACTS**

11.     Plaintiffs reallege all prior paragraphs of this complaint and incorporate the same herein.

12.     Defendant Metropolitan describes itself as the "largest provider of translators, transcription and interpretation services to the law enforcement community, government agencies and private corporations nationwide." It has offices in New York, Miami, Los Angeles, San Diego, Washington D.C. and Scottsdale, Arizona. Its corporate headquarters are located in New York. Defendant Metropolitan is engaged in commerce within the meaning of 18 U.S.C. § 2001.

13.     Plaintiffs were linguists working for Metropolitan who had been thoroughly screened, vetted and subjected to security clearance checks before being hired.

14.     After a thorough background investigation before hiring, Plaintiffs were given "Law Enforcement Access" which allowed to them to enter the

premises of DEA offices.

15.     In 2011, Defendants requested, required and demanded all linguists in San Diego and Imperial County submit to polygraph tests.

16.     A private employer is prohibited from requesting, requiring or demanding a polygraph test from an employee under the Employee Polygraph Protection Act, 29 USC §§ 2001, *et seq.*

17.     29 CFR 801.10(d) explicitly provides that : "This exclusion from the Act applies only to the federal, state and local government entity with respect to its own public employees. Except as provided in sections 7(b) and (c) of the Act, and § 801.11 of the regulations, this exclusion does not extend to contractors or non-governmental agents of a government entity, nor does it extend to government entities with respect to employees of a private employer with which the government entity has a contractual or other business relationship."

18.     Exclusions from the Act apply only to Department of Defense contractors; Department of Energy contractors with respect to the "atomic energy defense activities" of the DOE; the National Security Agency; the Central Intelligence Agency; and contractors of the FBI engaged in performance of work related to counter intelligence (defined as activities designed to protect against espionage, sabotage, terrorist activities or assassination).

19.     There is an exclusion for contractors' employees whose duties involve access to information that has been classified at the level of top secret or designated as being within a special access program under section 4.2(a) of Executive Order 12356 (or a successor Executive Order).

20.     Plaintiffs did not fall within any exclusion to the EPPA. Plaintiffs' duties did not involve access to information which was classified as "top secret."

21.     Plaintiffs' duties as translators involved access only to non-classified information which is defined as "Law Enforcement Sensitive."

5

22.     While such information may properly be restricted and its unauthorized dissemination proscribed, "Law Enforcement Sensitive" information is not classified information.

23.     Plaintiffs' duties did not involve access to information which was designated as being within a "special access program under §4.2(a) of Executive Order 12356."  Such a special access program involves limitation of access to national defense information, intelligence activities, or other "particularly sensitive information classified pursuant to Executive Order 12356 ."

24.     Wiretap transcripts are not classified information. Were they classified, any criminal case involving wiretaps would require declassification of the intercepted conversations under cumbersome administrative procedures before disclosure to the defendant, counsel, or to the court.

25.     Metropolitan could properly vet, investigate and screen Metropolitan employees who were to be involved in translation of Title III intercepts. Metropolitan and its client, the DEA, could legally enforce requirements of confidentiality and limitation of access to Title III intercepts.

26.     These intercepts, however, were not, under the EPPA, within the limited and highly restricted category which exempted Metropolitan or the DEA from the legal requirements of the EPPA.

27.     While Metropolitan and DEA could legally use any reasonable investigative or security procedure to screen employees or ensure the secrecy of Title III intercepts, the EPPA legally forbids the use of the polygraph in those efforts.

28.     While the DEA is exempted from the EPPA requirements with respect to its own employees, it is prohibited from requesting, requiring or demanding that a private contractor's employees submit to a polygraph under 29 USC §§ 2001, *et seq* unless the contractor falls under specified statutory

6

exceptions, none of which apply in this case.

29.     Instead of declining to force its employees into submitting to illegal polygraphs, Metropolitan Defendants agreed with, participated with, and aided and abetted the DEA in the violations of law described in this complaint.

30.     Metropolitan coordinated the testing; scheduled the tests for its employees; communicated with the employees regarding the tests; presented the order in which the tests would be given to the employees; and discharged the employees after they "failed" or refused the test or had inconclusive test results.

31.     Defendants failed to comply with 29 USC § 2007 (b)(4) which mandates that before any adverse employment action, the employer shall (A) further interview the examinee on the basis of the results of the test; and (B) provide the examinee with– (I) a written copy of any opinion or conclusion rendered as a result of the test, and (ii) a copy of the questions asked during the test along with the corresponding charted responses.

32.     When employees requested information from the DEA regarding the polygraph testing, these requests were not addressed by the DEA, but rather forwarded to Metropolitan defendants.

33.     Defendant J.C. approved, endorsed, ratified, and enforced the taking of the polygraphs by Metropolitan employees.

34.     Defendant R.P., a supervisor at Metropolitan, approved, endorsed ratified, and enforced the polygraph testing.

35.     Defendant R.P. placed the Plaintiffs on "laid-off status"  and implemented the termination of employees.

36.     Defendant C.G. coordinated all polygraph tests, often changing the date and time of the tests without warning, and notifying some employees of the testing via text messaging on employees' cell phones during their days off.

37.     In the spring of 2011, Defendant C.G .told Metropolitan employees

7

that "everyone will take the polygraph."  C.G. told them that "they" will let C.G. know when the testing will be; then C.G. will schedule the testing.

38.     Defendant C.G. told the employees that some of the employees in San Diego had already taken the polygraph.  The employees of the Imperial County office heard that the employees in San Diego failed the polygraph because they were engaged in illegal activities.

39.     Defendant C.G. made a schedule of the testing on a piece of paper with names, dates and times.  C.G. either texted or called the employees.

40.     Defendant C.G. coordinated efforts to mislead Plaintiffs and other employees regarding the polygraph examination by emailing them a link to a Youtube video produced by Center for Development of Security Excellence (CDSE) regarding the polygraph examination.

41.     This video was full of misleading and false information.  The video, peppered with references to "The Simpsons" cartoon indicated that there were no surprises during the examinations; that the polygrapher would explain to the examinees what to expect, what they are getting into and why they are getting into it; that all the polygraphers would try to make them fee at ease; the polygrapher will tell them exactly what is going to happen before they happen; that there are no surprises; that the polygrapher will go over what the examinees are thinking about or worried about before the examination; that there will be time to go over the consent form; that the examinees are giving voluntary consent; that the polygrapher will make sure the examinees understand what they are signing; that the examinees would not sign what they do not understand; that the examinees' rights are protected by the Fifth Amendment and the Privacy Act; that the results of the polygraph will not be released to anyone outside of "official channels"; that the polygrapher will video and audio tape the test so that the examinees are protected and that they capture everything correctly; that the recording will ensure

8

that the polygrapher will act professionally; that the polygrapher will explain the scope of testing and different types of questions; that during the test, there will be no questions asked they have not gone over during the pretest; that the polygrapher will go over the forms and instrumentation; that they will do a practice test so that the examinees will understand what the actual test will be like; that the actual test will last approximately six minutes in duration; that the polygrapher will not determine results of the test until "quality control" process has been conducted; that "quality control" is designed so that there is not just one person who makes a call; that there is a seasoned examiner who reviews the test; that there will be an unbiased eye to see if there is anything of concern; that the polygrapher will ensure that the examinees are not shortchanged; that nine times out of ten, there will be another examination if they do not "go through" the first time; that the polygrapher will give them every opportunity to be able to successfully complete the examination; that the polygrapher will make the examinees calm and comfortable; and that there is nothing to worry about.

42. **Plaintiff R.M.**   R.M.  was hired in March 2011 by Metropolitan.

43. R.M. was polygraphed on or about August 3.  C.G. told R.M. in a group meeting, that R.M. would be polygraphed.  C.G. indicated that R.M. would be tested at 10 a.m.

44.   On the date of the polygraph, C.G. called R.M. to tell her that her polygraph was changed to approximately 1 p.m.

45. R.M. was the second person in the El Centro office to be polygraphed.  She knew that if she didn't take the polygraph, she would be let go.

46. R.M. knew that people in San Diego who had failed the polygraph were let go.  She understood that if she wished to continue working for DEA, she had to take the polygraph.

47. C.G. would tell the monitors to "relax" and that they had "nothing to

hide."

48.    After R.M. "failed" the polygraph, the two DEA agents on her case interrogated R.M. and accused her of leaking information about their case.   She relinquished her security badge.

49.    R.M. messaged C.G. on FaceBook to ask her for a letter of recommendation, but C.G. never responded.

50.    R.P.  had told R.M. to complete the SF86 form before the testing. The SF86 was used as the basis for interview and polygraph test questions.

51.     **Plaintiff C. DlC.**   Plaintiff C. DlC. was polygraphed on or about August 3013.

52.    C.G. told Plaintiff C. DlC that she would have to be polygraphed as a part of her employment.

53.    Submission to the polygraph was part of Plaintiffs' employment by Metropolitan.  The polygraphs were administered during work hours and the employees were paid for their time spent undergoing the polygraph examination.

54.    Metropolitan effectively fired all employees who "failed," had inconclusive test results, or refused the test.

55.    The DEA had no legal right to administer polygraph tests to Plaintiffs, who were employees not of the United States, but of Metropolitan.  The EPPA prohibited the DEA from administering the polygraphs in this case under *inter alia*,  29 CFR § 801.10.  Metropolitan aided and abetted DEA in violating the statute.  Metropolitan's actions were independently in violation of the EPPA.

56.    Under the EPPA, any waiver of rights guaranteed by 29 USCS §§ 2001 *et seq.* is prohibited.  The rights and procedures may not be waived by contract or otherwise, unless such waiver is part of a written settlement agreed to and signed by the parties to a pending legal action or complaint under 29 USCS §§ 2001 *et seq.*

10

57.     On January 11, 2012, DEA sent a letter to J.C. that it had made a determination on January 10, 2012 that Plaintiffs had "an unfavorable suitability and/or security determination."  This letter was cc'd to Sandra Hester.

58.     On March 30, 2012, a Metropolitan official sent a letter to Plaintiffs that Metropolitan had received a "final determination letter" from DEA regarding the "polygraph examination administered to you by the Drug Enforcement Administration", stating that "Metropolitan employees at all levels are NEVER provided any of the details that contributed to your individual decision."  Attached to this letter was the January 11, 2012 letter from DEA.

59.     Each of the Defendants engaged in a joint venture, a common plan or scheme, and a civil conspiracy to violate multiple provisions of the EPPA.

60.     These wrongful act or acts were done pursuant to the agreement between the Metropolitan and each of the individually named Defendants.

61.     Each Defendant, as a member of the conspiracy, acted in concert and came to a mutual understanding to accomplish a common and unlawful plan, which was to engage in acts that violated the EPPA.

62.     All Defendants committed overt acts to further the conspiracy. In furtherance of their unlawful agreement, Defendants committed the following overt acts, among others:

   a.     Defendant C.G. coordinated the scheduling of the polygraph examinations of Metropolitan employees by email, text, verbal requests and facsimiles.

   b.     Defendant R.P. placed the Plaintiffs on "laid-off status"  and implemented the termination of employees.

   c.     Defendant R.P. disseminated the results of the polygraph examinations to officials of ICE.

   d.     Upon information and belief, Defendants used the results of the lie detector test and provided to ICE the results of the polygraph.

   e.     Defendants conspired with each other to disseminate polygraph examination results to others, including ICE.

11

f.  In March of 2012, Metropolitan and its employees used the DEA letter to Plaintiffs that they had "an unfavorable suitability and/or security determination." as a final determination with respect to Plaintiffs' employment.

63.  Defendants are joint tortfeasors. They are liable for all damages ensuing from the wrongs committed by their co-conspirators, irrespective of whether or not they were direct actors and regardless of the degree of their activity.

## V.
## FIRST CAUSE OF ACTION
## VIOLATION OF EMPLOYEE POLYGRAPH PROTECTION ACT
## 29 USC § 2002 (1)
## (Against All Defendants)

64.  Plaintiffs reallege all prior paragraphs of this complaint and incorporate the same herein.

65.  29 USCS § 2002 provides in relevant part:

Except as provided in sections 7 and 8 [*29 USCS §§ 2006, 2007*], it shall be unlawful for any employer engaged in or affecting commerce or in the production of goods for commerce--

(1) directly or indirectly, to require, request, suggest, or cause any employee or prospective employee to take or submit to any lie detector test

66.  Plaintiffs had a firmly established right under the Employee Polygraph Protection Act (EPPA), which prohibits employers from using any lie detector tests either for pre-employment screening or during the course of employment.

67.  Metropolitan is not entitled to an exclusion from the coverage under the EPPA because it is a private company.

68.  DEA in not entitled to an exclusion from the EPPA because Plaintiffs were not its direct employees.

69.  Defendants required, requested, and/or suggested that Plaintiffs take or submit to a lie detector test.

70.  Defendants directly and indirectly caused Plaintiffs to submit to a lie

12

detector test.

71.   Metropolitan,  J.C., R.P., and C.G. authorized the administration of the polygraphs, directly or indirectly requested that Metropolitan's employees submit to testing; and caused the testing to occur.

72.   As a direct and proximate result of Defendants' actions, Plaintiffs were subjected to humiliation, fear, loss of income, loss of reputation, loss of employment, and pain and suffering by the illegal acts of defendants and are entitled to compensatory damages, attorney fees and punitive damages.

**VI.**
**SECOND CAUSE OF ACTION**
**VIOLATION OF EMPLOYEE POLYGRAPH PROTECTION ACT**
**29 USC § 2002 (2)**
**(Against All Defendants)**

73.   Plaintiffs reallege all prior paragraphs of this complaint and incorporate the same herein.

74.   29 USCS § 2002 (2) provides that it is unlawful for an employer "to use, accept, refer to, or inquire concerning the results of any lie detector test of any employee or prospective employee."

75.   Defendants used, accepted and inquired about the results of the lie detector tests of the Plaintiffs.   Metropolitan Defendants inquired of results of the tests from DEA.  They accepted and used them.

76.   Metropolitan,  J.C., R.P., and C.G. used, accepted and inquired about the results of the lie detector tests to effectively terminate Plaintiffs from employment; process payroll; and manage unemployment status of Plaintiffs. These Defendants communicated with other agencies and individuals regarding the results of Plaintiffs' polygraph examinations.

77.   As a direct and proximate result of Defendants' actions, Plaintiffs were subjected to humiliation, fear, loss of income, loss of reputation, dissemination of defamatory information, loss of employment, and pain and

13

1  suffering by the illegal acts of defendants and are entitled to compensatory

2  damages, attorney fees and punitive damages.

3                                              **VII.**
                               **THIRD CAUSE OF ACTION**
4   **VIOLATION OF EMPLOYEE POLYGRAPH PROTECTION ACT**
                                **29 USC § 2002 (3)**
5                            **(Against All Defendants)**

6        78.    Plaintiffs reallege all prior paragraphs of this complaint and

7  incorporate the same herein.

8        79.    29 USCS § 2002 (3) provides in relevant part:

9            Except as provided in sections 7 and 8 [*29 USCS §§
             2006, 2007*], it shall be unlawful for any employer
10           engaged in or affecting commerce or in the production of
             goods for commerce--
11

12           (3) to discharge, discipline, discriminate against in any
             manner, or deny employment or promotion to, or
13           threaten to take any such action against--

14              (A) any employee or prospective employee who
             refuses, declines, or fails to take or submit to any lie
15           detector test, or
                (B) any employee or prospective employee on the
16           basis of the results of any lie detector test...

17       80.    Metropolitan discharged, disciplined and discriminated against the

18  Plaintiffs based on the results of the lie detector test or their refusal to submit to a

19  test.

20       81.    Metropolitan threatened to discharge, discipline, or discriminate

21  against Plaintiffs for refusal or failure to take or submit to a lie detector test.

22       82.    Metropolitan threatened to discharge, discipline, or discriminate

23  against Plaintiffs on the basis of the results of a polygraph test.

24       83.    Metropolitan discharged Plaintiffs for "failing" the polygraph.

25       84.    As a direct and proximate result of Metropolitan's actions, Plaintiffs

26  were subjected to humiliation, fear, loss of income, loss of reputation, loss of

27  employment, and pain and suffering by the illegal acts of defendants and are

28
                                              14

1   entitled to compensatory damages, attorney fees and punitive damages.

2

3                                     **VIII.**
                            **FOURTH CAUSE OF ACTION**
4                             **[INJUNCTIVE RELIEF]**

5           85.    Plaintiffs reallege  all prior paragraphs of this complaint and

6   incorporate  the same herein.

7           86.    Plaintiffs are informed and believe  and thereon allege  that, unless

8   enjoined, Defendants will continue to engage in the unlawful and tortious acts.

9           87.    Plaintiffs face  the real and immediate threat of repeated and

10  irreparable injury and continuing, present adverse effects as a result of the acts of

11  the Defendants.

12          88.    Plaintiffs have effectively been terminated from their jobs at

13  Metropolitan and have lost their security clearance.  Plaintiffs are therefore unable

14  to obtain similar employment elsewhere.

15          89.    Plaintiffs have no adequate and complete remedy at law.

16          90.    Plaintiffs are entitled to equitable relief under 29 U.S.C. §2005.

17          91.    Plaintiffs seek an order of the Court reinstating them to their

18  employment, requiring the destruction of all records of polygraph results in

19  Metropolitan's possession, and enjoining Metropolitan from dissemination of

20  polygraph information.

21

22                                    **IX.**
                              **PUNITIVE DAMAGES**

23          Defendants acted in deliberate disregard of Plaintiffs rights under the

24  Employee Polygraph Protection Act.  They acted with oppression, fraud and malice

25  and with reckless indifference to the federally guaranteed rights of Plaintiffs and

26  punitive damages should be assessed against each Defendant for the purpose of

27  punishment and for the sake of example.

28
                                        15

WHEREFORE, Plaintiffs pray  as follows:

1.      For general and special damages according to proof at the time of trial;

2.      For past and future lost wages and benefits and reinstatement of Plaintiffs' employment;

3.      For reinstatement and restoration of seniority rights;

4.      For expungement of record of the polygraph from the Plaintiffs' personnel files;

5.      For costs of suit and interest incurred herein and attorneys' fees pursuant to 29 U.S.C. §2005;

6.      For punitive damages; and

7.      Any further injunctive or declaratory relief this court deems just and proper.


DATED: July 30, 2014                          Respectfully submitted,

                                              S/ *Julia Yoo*
                                              _____
                                              EUGENE G. IREDALE
                                              JULIA YOO
                                              Attorneys for Plaintiff

16